Patrick Collins
John R. Morken
Darren A. Pascarella
FARRELL FRITZ, P.C.
400 RXR Plaza
Uniondale, New York 11556
(516) 227-0700

*Attorneys for Muffy Flouret, as Trustee of*
*the Mark Perlbinder 2023 Irrevocable Trust*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                               :
                                                     :          Case No. 25-73317-ast
BARTON MARK PERLBINDER,              :
                                                     :          Chapter 11
                                   Debtor.       :
------------------------------------------------------------x

## MOTION OF MUFFY FLOURET, AS TRUSTEE OF THE MARK PERLBINDER 2023 IRREVOCABLE TRUST, FOR AN ORDER DISMISSING CHAPTER 11 CASE

Muffy Flouret, as Trustee of the Mark Perlbinder 2023 Irrevocable Trust (the "Trustee"), by her attorneys, Farrell Fritz P.C., hereby moves for an order (a) pursuant to Section 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), dismissing this Chapter 11 case for cause, (b) pursuant to Section 305(a) of the Bankruptcy Code, dismissing this Chapter 11 case pursuant to principles of abstention, and (c) for such other and further relief as the Court deems just and proper (the "Motion"). In support of the Motion, the Trustee submits the Declaration of John R. Morken, Esq., dated September 22, 2025 (the "Morken Declaration"), and respectfully represents as follows:

### Preliminary Statement

1.     In his Local Bankruptcy Rule 1007-4 Certification, the Debtor acknowledges his transfer of assets into trusts in 2023, and indicates that he "will be seeking to avoid these transfers

pursuant to 11 U.S.C. § 548 and pursuant to New York Law" (Doc. No. 6 [Certification], ¶ 8). What the Debtor does not disclose in his Certification is this is the third court in which he is seeking to effectively undo the formation of trusts and related transfers that he himself voluntarily carried out with the advice of numerous professionals. Proceedings are pending currently in both the Suffolk County Surrogate's Court and in the New York County Supreme Court in which he has sought such relief without success. This bankruptcy case should be dismissed as having been filed with a lack of good faith as it is yet another instance of forum-shopping by the Debtor, as he has been accused of by the Supreme Court Justice in the Supreme Court action attacking the Trust.

## Background

2.      As described below, the Debtor voluntarily and knowingly transferred the bulk of his wealth, but not all, to the Mark Perlbinder 2023 Irrevocable Trust (the "Trust"). The Trust was formed for various reasons, including to enable it to serve as the vehicle to pay his debts. As also discussed below, the judicially filed accounting for the Trust indicates that the value of the Debtor's assets transferred to the Trust, almost entirely made up of business interests in properties in New York City and a field lot and residential property in Sagaponack, New York, is $200 million. This is far more than his indebtedness, although such is very substantial. A principal purpose for the creation of the Trust was to pay that indebtedness, and it is in a position to do so right now. Ironically, the Debtor himself, in his Suffolk County Surrogate's Court petition to void the Trust, stated that the assets he transferred into the Trust were such that his indebtedness for which the "the Trust was ostensibly designed to cover represent only a tiny fraction (approximately 6%) of that amount" (**Exhibit A**, ¶ 7).[1] [2]

---

[1] In the same paragraph of his petiton in Surrogate's Court, the Debtor claims he transferred assets "valued at over $800 million". No back-up is provided for such a large number. Nonetheless, it is clear that there are more than sufficient assets in the Trust to cover the Debtor's debts.
[2] Unless otherwise noted, references to "Ex. ___" herein refer to the exhibits annexed to the Morken Declaration.

3.      There are four proceedings pending in the Suffolk County Surrogate's Court involving the Trust and the Debtor.  Just days before the Debtor commenced this bankruptcy case, he entered into a Stipulation so-ordered by the Surrogate Judge agreeing that one of those proceedings, the "Possession Proceeding" brought by the Trustee to facilitate the Trustee's sale of the Sagaponack Property (one of the Trust's assets, as hereinafter defined) to enable the payment of the Debtor's liquidated debts, should be resolved expeditiously by summary judgment.  It is evident that the Debtor filed this bankruptcy case to obtain a stay of the Possession Proceeding while he launches his avoidance action in this court, seeking relief he has been unable to obtain in the proceedings in Surrogate's Court and Supreme Court.

**A.      <u>Creation and Purposes of the Mark Perlbinder 2023 Irrevocable Trust</u>**

4.      As of early 2023, the Debtor, then 80 years of age and despite owning many valuable real estate holdings, had ran up debts in liquidated amounts of approximately $30 million because of his many poor decisions.  These poor decisions included not paying his personal income taxes for many years (going back to 2017), not satisfying his ongoing indebtedness to his ex-wife Dara Perlbinder ("Dara"), and not paying his lawyers for their representation of him in the many litigations in New York Supreme Court by and against his relatives in which he was and remains a party.  Against this backdrop, the Debtor made one very wise choice.  He asked Muffy, his only child, to help him address his debts, manage his many litigations, and also help formulate estate planning measures that he had long neglected.

5.      After months of discussions, represented by counsel and with full knowledge of the consequences of his actions, the Debtor established the Trust on August 28, 2023 (**Exhibit B** [Trust Agreement]).  Muffy agreed to act as Trustee.

---

As noted in the Morken Declaration, certain of these exhibits omit documents appended as exhibits to them.

6.     The Debtor created the Trust for multiple reasons including, among other things, (i) to help manage the numerous, and increasing, lawsuits in New York Supreme Court, commencing in 2021, brought against him by his brother and other family members alleging, among other things, fraud and conversion, with the Debtor having been held in contempt of court in one of those proceedings (the "Supreme Court Actions"), which are described in more detail below;[3] (ii) to ensure the continued representation of his primary defense counsel of record in the Supreme Court Actions, Rosenberg & Estis, P.C. ("R&E"); (iii) to implement certain family estate planning measures; and (iv) perhaps most importantly for purposes of this Motion, to allow the Trustee to assist in cleaning up his existing and ever-growing debts, which at the time of the Trust's creation approximated $30 million dollars (including some $20 million in unpaid federal and state taxes including interest and penalties).[4]

7.     As reflected in the Trust's judicial accounting filed in the Suffolk County Surrogate's Court (**Exhibit C** [Accounting]), the Debtor's interests in eighteen (18) different entities were transferred into the Trust.  These interests are primarily LLC and partnership interests in family entities that own and operate real estate in New York City for investment purposes.  Also transferred into the Trust was the real property with an address of 615 Daniels Lane, Sagaponack, New York (the "Sagaponack Property"), the oceanfront house at which the Debtor maintains his primary residence, which had been solely owned by him.

---

[3] The Trust has helped manage the Supreme Court Actions by, among other things, being substituted for the Debtor in many of these actions.

[4] The Debtor alleges in his Certification that his debts include unliquidated amounts asserted against him in the Supreme Court Actions (Doc. No. 6, ¶ 8).  However, at the time of the creation of the Trust, and continuing to this date, there are various existing debts that are liquidated, with very specific amounts, including at least two judgments against him.  Confession Judgments have been entered against the Debtor by R&E in the amount of $4,486,807.83 and by Dara in the amount of $1,219,452.05 (**Exhibit D** [Judgments]). Interest on the former is running at $1,106.26 per day, and on the latter at $300.69 per day.

8.     The Trust's purpose to pay the Debtor's Existing Debts (as hereinafter defined) is spelled out on page 2 of the Trust Agreement, which provides:

> C.     Reduction in Settlor's Existing Debt/Distributions of Principal.
>
> The Settlor and Trustee agree that satisfaction and elimination of the Settlor's Existing Debts (as herein defined) is of utmost importance to the overall health and financial and personal well-being of the Settlor.

(Ex. B [Trust Agreement], Art. III, ¶ C., p. 2).

9.     The Trust Agreement defines "Settlor's Existing Debts" as "all enforceable obligations of the Settlor", including: "(i) any and all existing tax obligations … (ii) any and all existing obligations to the date of its reference to Dara Perlbinder, including any interest thereon, as a result of the Stipulation of Settlement dated April 29, 2013 … (as of the date of execution of this Trust Agreement, there is a Three Million Dollar ($3,000,000) principal balance currently past due and owing pursuant to the Settlement Agreement and Six Hundred Fifty Thousand Dollars ($650,000) of additional principal balance loaned by Dara Perlbinder to the Settlor)" (Ex. B [Trust Agreement], Art. XVIII, ¶ M, p. 47). Also included in the definition of Settlor's Existing Debt is explicit reference of $940,000 owed to a friend of the Debtor, "Liliane Angeli", "subject to adequate documentation of loans", and "all monetary obligations to the date of its reference to the following law firms …", listing several law firms, including R&E (*id.*).

10.    The Trust Agreement describes what the Trustee will do to ensure the satisfaction of those debts. The Trust Agreement directs the Trustee to set aside the net proceeds from the sale of any asset of the Trust for the purpose of paying the Existing Debts (Ex. B [Trust Agreement], Art. III, ¶ C, p. 2). Notably, the Trust Agreement also permits the Trustee to carry out the sale of the Sagaponack Property if certain contingencies occur (*id.* at Art. III, ¶ D, pp. 3-5).

11.     Thus, it is clear that the Trust was formed not to frustrate or evade the Debtor's creditors, but to address their claims and to ensure payment of the Debtor's obligations.

**B.     The Surrogate's Court Proceedings and the August 22, 2025 So-Ordered Stipulation**

12.     The Trust Proceeding was commenced with the filing of the Debtor's Verified Petition dated December 3, 2024, in the Suffolk County Surrogate's Court (Ex. A).  The Petition seeks "an order invalidating, and thereby immediately terminating and unwinding, the Irrevocable Trust, in its entirety, as void *ab initio* given that Mark was forced to settle it under duress, coercion, fraud, undue influence, and elder abuse …   or, in the alternative, immediately suspending and, thereafter, permanently removing Muffy from her fiduciary role as trustee of the Irrevocable Trust …; and, in either event, both compelling Muffy to file a final account for her actions as trustee of the Irrevocable Trust … and surcharging Muffy for, among other things, her numerous breaches of fiduciary duties and blatant misconduct …" (*id.* at p. 1).

13.     The allegations contained in the Petition are aggressively disputed in the Trustee's Verified Answer dated January 27, 2025 (**Exhibit E**).  The Answer details the background leading up to the creation of the Trust in August, 2023, and the need for and efforts then made to sell the Sagaponack Property.  It also sets forth various affirmative defenses.

14.     The four proceedings currently pending in the Suffolk County Surrogate's Court, discussed more fully below, are: (i) the Trust Proceeding;  (ii) the Trustee's proceeding to compel the Debtor to vacate the Sagaponack Property so that it can be sold in order to pay his debts, which he has prevented from happening by obstructive conduct for the past year and a half (the "Possession Proceeding");  (iii) the Trustee's petition to approve her accounting showing all transactions of the Trust from its inception in August 2023 through March 2025 (the "Accounting

Proceeding"); and (iv) a proceeding brought by the Debtor's lawyers for payment of fees from the Trust (the "Fee Proceeding").

15.     With the onslaught of litigation starting with the Debtor's suit to void the Trust, Surrogate Judge Messina directed mediation to take place among the parties – the Debtor, the Trustee, and Dara (Mark's former wife) – which commenced before retired Judge Stephen L. Braslow on March 25, and continued on May 6, May 22, June 24, July 1 and August 14, 2025. Recognizing that the most immediate issue that needed to be resolved was the payment of the Debtor's debts, at the last mediation session, on August 14, 2025, the parties, including the Debtor and his attorney, agreed that the Trustee's motion for summary judgment in the Possession Proceeding should be expedited, with the other Surrogate's Court proceedings all to be held in abeyance. This was reflected in a Stipulation dated August 15, 2025, so ordered by the Surrogate on August 22, 2025 (**Exhibit F**).

16.     Significantly, in the Stipulation, the parties through counsel all agreed that:

WHEREAS at a settlement conference with Judge Braslow on August 14, 2025, it was agreed that a resolution of the Trust Proceeding, the Fee Proceeding, and the Accounting Proceeding could be materially affected and facilitated by the determination or resolution of the Possession Proceeding; and

WHEREAS a motion for summary judgment will be filed in the Possession Proceeding by the petitioner therein no later than August 22, 2025;

WHEREAS the parties desire to conserve judicial resources, conserve expenses to all parties and the subject trust, and avoid potentially unnecessary litigation; and

WHEREAS no party will be prejudiced by holding the Trust Proceeding, the Fee Proceeding, and the Accounting Proceeding in abeyance pending determination or resolution of the Possession Proceeding;

17.     The Trustee filed her motion for summary judgment in the Possession Proceeding, with an Order to Show Cause which was entered by the Surrogate on August 25, 2025. Copies

of the entered Order to Show Cause and relevant portions of the motion for summary judgment are attached hereto as **Exhibit G**.  Pursuant to the Stipulation, the Debtor and his counsel agreed to hold the Trust, Accounting, and Fee Proceedings in abeyance, and that the motion for summary judgment on the Possession Proceeding should be submitted and decided.  This was agreed to by the parties and so ordered by the Surrogate just six days before the Debtor commenced his bankruptcy case.  It is now evident that the Debtor filed his bankruptcy case to obtain a stay of the Possession Proceeding.

### C.  <u>The Supreme Court Proceedings to Void the Trust</u>

18.     In April, 2025, and while the mediation in the Trust Proceeding in Surrogate's Court was ongoing, the Debtor filed a Verified Complaint in Supreme Court, New York County, in which he sought to have the Supreme Court declare the Trust void, and for other relief against the Trustee and R&E.  With his Supreme Court Complaint, the Debtor filed an order to show cause seeking a temporary restraining order against the Trustee.  The TRO application was heard before Justice Joel M. Cohen on May 9, 2025, the transcript of which is attached hereto as **Exhibit H**.  The Debtor's counsel argued that the reason for the request for the TRO was to prevent the Trustee from disposing of any assets of the Trust, and in particular, to prevent her from selling the Sagaponack Property (Ex. H [May 9, 2025 Hearing Tr.], 6:11–6:18, 8:21–8:25).  Not only did Justice Cohen deny the request for a TRO, he even refused to sign the order to show cause.  Significantly, Justice Cohen held as follows:

> I'm going to deny the TRO, and I'm also going to decline to sign this motion.
>
> ***
>
> The most obvious flaw in this motion is that it duplicates … issues that are being litigated in Surrogate's Court, voluntarily, by the same [Debtor], with different counsel.  This is … an incredibly wasteful exercise and is something that very well may be susceptible to dismissal under 3211(a)(4).

***

And so, having this -- expanding this -- already sprawling litigation to have the same issues be in front of two courts at the same time is inappropriate, frankly, and certainly in terms of seeking extraordinary relief.

***

And I think, here, [Debtor's] litigation conduct sort of speaks for itself here. You know, they have a court where this is being litigated and then it was brought in this court in a way that, candidly, did not follow general rules and due process in terms of providing notice to the appropriate people.

***

The notion that this was filed without seeking out and ensuring that the opposing parties were given advance notice is, frankly, not defensible; and this could well, but for the sharp eyes of Judge Schecter's courtroom staff, have gone to a judge who would have no reason to understand what the background was and without the defendants having any notice of it. And the rules are there for a reason.

***

And again on the merits: Because this is duplicative of another action, I think that does go to the merits of this application. I don't know whether this is forum-shopping I don't know what's going on in Surrogate's Court, whether the [Debtor] is concerned about how that's going to go. But that's not a good reason, either, to just shop this case to this court, particularly where the principal relief being sought in this motion is the sale of the Sagaponack house and, you know, more broadly, to remove the trustee. But that's exactly what that other case is about.

(Ex. H [May 9, 2025 Hearing Tr.], 41:17—41:18, 41:24—42:5, 42:9—42:13, 42:16—42:21, 43:7—43:13, 43:21—44:6).

19.     Undaunted by this excoriating ruling by Justice Cohen, accusing the Debtor of what appeared to the Justice as forum-shopping, the Debtor perpetuated his strategy of litigating Trust issues simultaneously in both the Suffolk County Surrogate's Court and the New York County Supreme Court. On May 29, 2025, the Debtor filed on NYSCEF a further Summons and "First Amended Verified Complaint" in the Supreme Court, purportedly amending the Complaint for which the Debtor's counsel had been severely criticized but seeking essentially the same relief, a

9

declaration that the Trust "was procured by fraud, duress, and breach of fiduciary duty." (**Exhibit I**).[5]

20.     Simultaneously, in a display of clear gamesmanship, the Debtor brought a motion in the Surrogate's Court to amend his Petition in the Trust Proceeding, to delete the first cause of action seeking to void the Trust, but then to add other parties and other causes of action, such as a cause of action seeking the removal of Muffy as Trustee of the Trust (**Exhibit J**).  The motion to amend was granted by the Suffolk Surrogate on July 21, 2025 (**Exhibit K**).  The Amended Petition has not yet been filed by the Debtor.

D.     **Accounting Proceeding**

21.     The Debtor's Trust Proceeding also demands an accounting of the Trust.   The Trustee immediately agreed to file an accounting (the "Accounting"), which was done on May 5, 2025 [Ex. C [Accounting]).

22.     In his Certification in this bankrutcy case, the Debtor disingenuously claims not to have "a reliable list of all assets that were transferred or the value of such assets" (Doc. No. 6 [Certification], ¶8).  To the contrary, on the very day he signed the Trust Agreement, the Debtor executed an "Assignment of Entities and Real Property" (the "Assignment"), listing the assets assigned (Ex. B, Assignment appended to Trust Agreement).  Furthermore, Schedule A of the Accounting lists very specifically the assets transferred into the Trust, with an inventory value in the sum of $199,849,206 (Ex. C [Accounting], Schedule A at pp. 4-5).[6]

---

[5] As of the date hereof, said Summons and Amended Complaint have not been served by the Debtor on the named defendants, including the Trustee. The action has been stagnant.

[6]  This list of entities and valuations did not include values for six of the eighteen entities, these all being interests in entities which own garages that have either zero, de minimis, or uncertain value (Ex C., Schedule J at p. 97).

23.     Schedule J of the Accounting comprises a narrative by the Trustee detailing (i) the funding of the Trust and the estate tax planning involved, (ii) that certain of the Debtor's properties were not transferred to the Trust, (iii) the estate planning measures taken by the Debtor in connection with the formation of the Trust, (iv) the entry of judgments against the Debtor, both by R&E and by Dara, and (v) how the Trustee has, in the past two years, addressed the Debtor's multiple debt obligations while spending hundreds of thousands of dollars for expenses associated with the Sagaponack Property (*id.*, Schedule J).

24.     Schedule J of the Accounting also describes some assets not transferred into the Trust, those being the Debtor's interest in Perlbinder Construction LLC, and a limited number of real estate entities that were inactive (*id.*, Schedule J at p. 98).  Perlbinder Construction LLC was not transferred so as to enable the Debtor, through Muffy acting as agent under a power of attorney, to "sell three apartments at 211 Madison Avenue, New York, New York, owned by Perlbinder Construction, LLC".  In fact, those apartments were sold by Muffy during 2024.  A portion of the net proceeds were paid to the IRS, to help bring down the Debtor's debt, in the amount of approximately $3.8 million.  The IRS is still owed close to $10 million, with interest and penalties running.

**E.     The Family Supreme Court Litigations, Contempt Holding,
        and Appointment of Receiver**

25.     In 2021, the Debtor's brother, Stephen, and Stephen's daughter Astrid Sabella Rosa ("Astrid"), as trustees of two of Stephen's family trusts, sued the Debtor for damages associated with one of the real estate entities owned by the Debtor and Stephen (Supreme Court Index No. 655732/2021).  Stephen subsequently commenced another action against the Debtor, also seeking damages with regard to specified real estate entities in which they both held ownership interests

(Index No. 656259/2021). R&E appeared for the Debtor in both of these proceedings, as they had previously represented him with regard to real estate administration issues.

26. Then, in 2024, subsequent to the creation of the Trust, two further actions were commenced in the Supreme Court, New York County, as between Stephen, Astrid, and the Debtor, as well as the Trust. Several other actions have been commenced in the Supreme Court as well, involving other family members.

27. Notably, in an Order dated June 6, 2022, Justice Cohen held the Debtor in civil contempt, directing him to pay specified sums of money to purge his contempt (**Exhibit L**). The transcript bears on the credibility of the Debtor, including the following statements made by Justice Cohen: "It's also clear that the Order was disobeyed. And that the defendant [the Debtor], obviously, was aware of the court's order. The only question here is whether this was an honest mistake, and to me, the evidence just simply doesn't come close to establishing that, and I find that the evidence presented here is just not credible to me." (*id.* [June 1, 2022 Hearing Tr.], p. 34:6—34:9). Summarizing the Debtor's conduct, Justice Cohen stated: "this is just a blatant disregard of the court Order" (*id.*, p. 34:24—34:25).

28. As noted above, the Trust has interests transferred to it by the Debtor in eighteen entities that own buildings, parking garages, and a parking lot in New York City (collectively, the "Entities"). They are all subject to a dissolution proceeding in the Supreme Court, New York County (Index No. 155612/2024, the "Omnibus Dissolution Proceeding"), and are currently under the control of a Receiver. The Order appointing the Receiver, dated June 17, 2025 (**Exhibit M**), among other things, assigns the Receiver managerial powers over the entities, and further directs him to "marshal and liquidate the assets, if any, and discharge the liabilities, if any, of the Dissolved Entities" (*id.*, p. 14).

29.     The Debtor and the Trustee are Petitioners in the Omnibus Dissolution Proceeding. The other parties to the Omnibus Dissolution Proceeding are Stephen, Astrid and Stephen's other daughter, Andrea Jo Stein, and trusts in which they have interests, all of whom the Debtor has been at war with for four years.

30.     Needless to say, marketing and selling any of the Entities or their assets will take a considerable amount of time.  Further, the proceeds from the sale of any of the Entities' assets would be subject to the multiple damage claims asserted against the Debtor.

31.     The Order appointing the Receiver requires the Receiver to obtain Supreme Court approval before making any payments or distributions of sale proceeds from the Entities to any party — including the Trust (Ex. M, Section VI ¶ 1)  – which receipt is required of course before the Trust has any ability to use such funds to address the Debtor's Existing Debt.  In fact, after liquidating the Entities' assets, the Receiver is required to file a report and recommendation for judicial approval, which will include a proposed final plan for distributing the assets to the parties (*id*. at p.15).  The parties to the Omnibus Dissolution Proceeding then have 30 days to object to the Receiver's report and recommendation. Due to the many claims and counterclaims pending among the parties, the Receiver's report is likely to be highly contested, and of course, with any determination subject to appeal.  As a result, it will likely take a long time before the Receiver obtains Court authorization to make payments or distributions to the Trust.

32.     And in the meanwhile, interest and penalties continue to run on the income taxes owed to the IRS and New York State, and statutory interest on the existing judgments against the Debtor, all in the many thousands of dollars per day.  The only solution to the exorbitant debt, as the Debtor begrudgingly realized when he settled the Trust, is the sale of the Sagaponack Property. But the Debtor reneged.

**F.      The Debtor Frustrates the Trustee's Efforts to Sell the Sagaponack Property**

33.      As noted above, a very significant purpose of the Trust is to satisfy the Debtor's past, present, and future debts.  The Sagaponack Property, currently listed for sale at $85 million, is the only Trust-owned asset that can generate enough liquidity to fulfill that purpose.  This is so because it is the only Trust asset not tied up in litigation with the Debtor's family members, or under the control of the court-appointed Receiver, or co-owned by the Debtor's other relatives, many of whom have enmity for the Debtor and have asserted claims against him.   These proceedings are all pending in the New York Supreme Court as described above.

34.      When negotiating the terms of the Trust Agreement, the Debtor agreed to three separate contingencies which, if any one was triggered, confer the Trustee with authority to sell the Sagaponack Property.   As detailed in the Trustee's Verified Petition in the Possession Proceeding (**Exhibit N**), all three conditions have been triggered.

35.      The first contingency provision authorizes the Trustee to sell the Property if the Trust covers shortfalls in the Sagaponack Property's carrying charges for 8 months totaling at least $240,000 (Ex. B, Art. III, ¶ D(2), p.3)  The Trust has covered this shortfall for 17 months for a total of $606,697.79 (Ex. G).

36.      The second contingency provision provides the Debtor with the authority to irrevocably direct the Trustee to sell the Property  (Ex. B, Art. III, ¶ D(3), p.4).   In December 2023, the Debtor exercised this authority when he executed the Agreement Regarding Trustee Sale (**Exhibit T**), which not only authorizes but requires the Trustee to sell the Property.

37.      The third contingency provision provides the Trustee with "full investment control" over the Property when just one of the Trustee's many creditors initiates an enforcement action. (Ex. B, Art. III, ¶ D(6), pp.4-5).  Two have done so.  First, the Debtor's ex-wife has taken steps

to enforce her judgment against him. She has served subpoenas on the Debtor, seeking documents and to examine him under oath (**Exhibit S**). Second, as detailed in an affidavit from Kevin Flynn, Esq., an attorney retained by the Trustee to address the Debtor's unpaid tax debts (**Exhibit U**), the IRS filed several federal tax liens and notices of levy against the Debtor. In December 2024, the IRS filed a nominee lien against the Trust, attaching the Sagaponack Property. More recently, in July 2025, the IRS informed Mr. Flynn that it commenced efforts to seize and sell the Property by public auction, potentially for significantly less than fair market value, with a possible loss to the Trust of many millions of dollars (Ex. U, at ¶ 21).

38.     Without question, the Trustee is authorized to sell the Sagaponack Property. Fulfilling her fiduciary duties and the expressed purpose of the Trust requires it. Nevertheless, the Trustee's efforts to sell the property have been obstructed repeatedly by the Debtor for the past year and a half, such that the property cannot be sold while he occupies it. Thus, the Trustee was compelled to file the Possession Proceeding. A copy of the Petition with exhibits is attached to the Morken Declaration as **Exhibit N**, spelling out in detail the necessity for the relief requested, and attached as **Exhibit O** to the Morken Declaration is an affidavit, dated March 8, 2025, from Timothy Davis (the "Davis Affidavit"), the broker handling the sale of the Sagaponack Property, describing in detail the Debtor's obstructive behavior.

39.     In early 2024, Davis listed the Sagaponack Property for $85 million. On at least five occasions from August 31, 2024, to January 8, 2025, the Debtor denied Davis access to the property. On two occasions, July 25 and August 12, 2024, the Debtor's girlfriend made prospective purchasers uncomfortable by motioning as if videotaping them as Davis showed them the property. On one occasion, the Debtor met Davis in the driveway. He refused to allow Davis access to the property. The Debtor called the police, who responded to the property (Ex. O). On

another occasion, the Debtor drove his Porsche at a high rate of speed in the driveway and on the lawn (**Exhibit P** [Roman Sanford Security Incident Report dated September 1, 2024], p. 2). Upon seeing this, the prospective buyers told Davis that they did not feel comfortable or safe, and left. (**Exhibit Q** Supplemental Davis Affidavit dated August 21, 2025 p. 2, ¶8).

40. Upon information and belief, the Debtor also damaged the Property to prevent a sale. On January 28, 2025, the housekeeper found cascading water stemming from the upstairs bathroom. Someone had turned the bathtub water on and dropped tissues in the bathtub. The tissues somehow became stuck in the bathtub's overflow drain (**Exhibit R** [E-mail chain dated January 28, 2025], p. 5).

41. The Debtor's obstructive behavior continued in 2025. Supplemental Davis Affidavit (Ex. Q). As Davis notes, after describing the Debtor's continued activities, "the greatest obstacle to selling the Property remains the public knowledge that [the Debtor] occupies it and has no intention of leaving it. Buyers of properties such as this one have little interest in having a closing delayed pending a court proceeding to evict the current occupant. There is even less interest in buying a property at this price point and then assuming the burden of removing the occupant" (*id.* at ¶8).

42. The Trustee commenced the Possession Proceeding to address this obstruction by the Debtor and to facilitate the sale of the Sagaponack Property so that the Existing Debts can be paid.

43. It should be noted that the Sagaponack Property's carrying costs are exorbitant. As the Accounting filed by the Trustee in the Surrogate's Court shows, through March of 2025, the trustee paid over $600,000 towards the carrying costs of the Sagaponack Property (Ex. C, p. [Accounting], p. 45-89).

44.     Finally, the fact is that the Sagaponack Property is not the Debtor's only residence. As noted in the Trustee's affidavit in summary judgment, "my father [Mark] divides his time between the [Sagaponack] Property and his Manhattan apartment located at 429 East 52nd Street" (**Exhibit S** p. 2 ¶7).  That apartment, in a building owned in part by the Trust, is available for him to reside in, and of course, upon the sale of the Sagaponack Property, there will be sufficient funds to rent or perhaps purchase another residence, if the Debtor so desires.[7]

## G.     The Debtor's Bankruptcy Filing

45.     On August 28, 2025, the two-year anniversary of the formation of the Trust and just a few days after stipulating in the Surrogate's Court for the Possession Proceeding to move forward on an expedited basis, the Debtor commenced this bankruptcy case.

46.     The Debtor complains in his Certification that the transfer of most of his assets to the Trust and related trusts has left him unable to meet his monthly expenses or pay his outstanding debts (Doc. No. 6, ¶ 3).  The Debtor states in his Certification that he will seek to avoid the transfer of his assets into the Trust "pursuant to 11 U.S.C. § 548 and pursuant to New York Law" (*id.* at 8), and he lists in his response to question 18 in his Statement of Financial Affairs (Doc. No. 10) the prepetition transfers of assets into the Trust and related trusts that he will presumably seek to avoid if this bankruptcy case is allowed to proceed.

47.     The Debtors' Schedules of Assets and Liabilities (Doc No. 10) are consistent with his Certification; they identify virtually no assets other than his interest in the Trust and related trusts.  The Debtor list numerous creditors in his schedules of liabilities, but almost all of them are listed as holding claims in unknown amounts that are disputed.

---

[7] The Court should also be aware that Dara, Mark's former wife, recently broke her hip and fractured her shoulder in a fall, resulting in surgery.  Her mobility is limited and she requires 24 hours per day assistance from a home health aide.  Dara needs the money the Debtor is obligated to pay her.  (Ex. S p. 2 ¶9).

48.     The Debtor has evidently not read the Assignment he executed on the same day as he signed the Trust Agreement (Ex. B [Assignment appended to Trust Agreement]), or the detailed accountings provided by the Trustee (Ex. C [Accounting]), as he professes in his Certification to be unable to obtain a reliable list of assets transferred to the Trust or their value (Doc. No. 6, ¶ 8).  The Debtor indicates he intends "to utilize the bankruptcy process to gain a full understanding of those transfers" (*id.*).  But the Debtor is presently seeking this same relief in the Accounting Proceeding pending in Surrogate's Court.

49.     The Debtor's Certification is silent concerning how the Debtor intends to reorganize his financial affairs in this Chapter 11 case.

### Jurisdiction

50.     This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.  The statutory predicates for the relief sought herein are Sections 1112(b) and 305(a) of the Bankruptcy Code.

### ARGUMENT

I.

### CAUSE EXISTS TO DISMISS THE BANKRUPTCY CASE FOR HAVING BEEN FILED WITH A LACK OF GOOD FAITH

51.     Section 1112(b) governs the dismissal of a Chapter 11 case.  It provides, in pertinent part:

> (1) . . . [o]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court **shall** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. §1112(b) (emphasis supplied).

52.     Thus, a bankruptcy court may dismiss a Chapter 11 case "for cause" pursuant to 11 U.S.C. § 1112(b). Although section 1112(b) does not explicitly require that cases be filed in "good faith," the Second Circuit Court of Appeals and other courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal. *See, e.g., In re C-TC 9th Avenue Partnership*, 113 F.3d 1304, 1310 (2d Cir. 1997); *In re Marsch,* 36 F.3d 825, 828 (9th Cir. 1994); *In re Little Creek Dev. Co.,* 779 F.2d 1068, 1072 (5th Cir.1986). "The existence of good faith depends on an amalgam of factors and not upon a specific fact." *In re Marsch,* 36 F.3d at 828 (*citing In re Arnold*, 806 F.2d 937, 939 (9th Cir.1986)). The test is whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis. *Id.*

53.     Bankruptcy courts have broad discretion to dismiss a Chapter 11 case for cause. *In re C-TC 9th Avenue Partnership*, 113 F.3d at 1310-12 (affirming dismissal of Chapter 11 petition as a bad faith filing); *In re D&G Construction Dean Gonzalez, LLC*, 635 B.R. 232, 238 (2021); *In re Bridge to Life, Inc.*, 330 B.R. 351 (Bankr. E.D.N.Y. 2005) (denying motion to reconsider dismissal of a Chapter 11 case as bad faith filing); *In re 234-6 West 22nd Street Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997) (dismissing chapter 11 case noting that, where the circumstances require dismissal on bad faith grounds "a judge must not shrink from ordering it").

54.     The courts recognize that a Chapter 11 petition "is not filed in good faith unless it serves a valid reorganizational purpose." *In re SGL Carbon Corp*., 200 F.3d 154, 165 (3d Cir. 1999) (*citing In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994)). Thus, "because the filing of a Chapter 11 petition merely to obtain tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws,' courts have typically dismissed Chapter 11 petitions under these circumstances as well." *SGL Carbon,* 200 F.3d at 165 (*quoting In re Marsch*, 36 F.3d at 828); *see*

*also Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("The bankruptcy provisions are intended to benefit those who are in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation").

55.     A Chapter 11 filing may not be "employed to obtain an upper hand or leverage in litigation with another party or to provide an alternate forum for such litigation. As another bankruptcy court in this district emphasized:

> Chapter 11 petitions filed for the purpose of frustrating the legitimate processes of a non-bankruptcy forum constitute use of the reorganization vehicle inconsistent with the congressional intent. Chapter 11 relief should not be available to entities filing to obtain a perceived advantage in litigation with others or to provide an alternative judicial forum…
>                                          …
> An important factor to consider in determining whether a Chapter 11 case was initiated in good faith is whether the reorganization effort essentially involves a two-party dispute which can be resolved in a non-bankruptcy forum. These Chapter 11 cases do not represent efforts pitched to a "business's reorganization" or to "restructure a business's finances". They are essentially a two-party civil lawsuit involving non-bankruptcy law brought in the bankruptcy court in the guise of being a reorganization of some sort under Chapter 11. Chapter 11 was never intended to be used as a fist in a two party bout. The Chapter is entitled reorganization not litigation."

*Bridge to Life, Inc.*, 330 B.R. at 357 (quoting *In re HBA East, Inc.*, 87 B.R. 248, 260 (Bankr. E.D.N.Y. 1988)); *D&G Construction*, 635 B.R. at 239 ("A bankruptcy filing is made in bad faith if the petition was found to have been filed solely to avoid the consequences of adverse state court litigation.").

56.     Here, it is evident that the Debtor commenced this bankruptcy case as a tactic in his litigation with the Trustee to obtain a stay while he seeks the same substantive relief in this Court – prevent the sale of the Sagaponack Property and invalidate and unwind the Trust. But the Debtor is no stranger to these tactics, as the bankruptcy filing is just his latest maneuver to obstruct the Trustee's efforts to carry out one of the principal provisions of the Trust, *i.e.*, to satisfy the

Debtor's substantial (and growing) debts by the only means possible in the near and foreseeable future, selling the Sagaponack Property.

57.     The Debtor knew full well when he agreed to and executed the Trust Agreement and associated documents what they provided and the advantages they afforded him, as they were the product of extensive and intensive negotiations. Indeed, there have been many instances where the Debtor ratified the Trust he created, including, almost six months after its creation, by executing the Agreement Regarding Trustee Sale, in which the Debtor reaffirmed the Trustee's authority to sell the Sagaponack Property and committed to not interfere with that effort (**Exhibit T** [Agreement Regarding Trustee Sale]).

58.     Unfortunately for all involved, however, the Debtor became afflicted with a severe case of buyer's remorse when the Trust provisions requiring the Trustee to sell the Sagaponack Property were triggered, resulting in a continuation of the recklessness and juvenile conduct that caused his massive indebtedness.

59.     The Debtor's antics started with denying the listing broker access to the Sagaponack Property. When potential buyers came to tour the property, the Debtor would call the police. Another technique used to harass buyers was to follow them around the property with a video camera (Ex. O 3/8/25 Davis Affidavit] at ¶¶ 6-8; *see also* Ex. Q [8/21/25 Davis Affidavit]). The Debtor has gone so far as to drive his Porsche on the property's lawn at a high rate of speed with potential purchasers present (Ex. R [Roman Sanford Security Incident Report dated September 1, 2024], p. 2). The Debtor even purposely flooded the property by placing tissues in the tub drain and leaving the house with the tub water running, causing extensive damage (Ex. R [E-mail chain dated January 28, 2025]).

60. The Debtor's initiation of the Trust Proceeding in the Surrogate's Court, wherein he seeks to invalidate the Trust, to remove Muffy as Trustee, and to compel an accounting, was yet another obstructive tactic. Then, while the mediation in the Trust Proceeding was ongoing, the Debtor commenced an action in Supreme Court, New York County, seeking substantially the same relief he sought in the Trust Proceeding. But Justice Cohen saw through the Debtor's subterfuge, stifling his unabashed attempt at forum-shopping (Ex H [May 9, 2025 Hearing Transcript], 43:24—44:2) ("I don't know what's going on in Surrogate's Court, whether the [Debtor] is concerned about how that's going to go. But that's not a good reason, either, to just shop this case to this court…").

61. And, significantly, the Debtor and his counsel agreed in a "So Ordered" stipulation to hold the Trust, Accounting, and Fee Proceedings in abeyance until the Trustee's motion for summary judgment in the Possession Proceeding was decided by the Surrogate. Of course, the Debtor's filing of his bankruptcy petition just days later caused those proceedings to be stayed so he could now try his hand in this Court.

62. This conduct should not be countenanced. The bankruptcy court is the third forum in which the Debtor commenced a proceeding to unwind the Trust and remove the Trustee. The Debtor's affinity for forum shopping should be dealt with by this Court as swiftly as it was by Justice Cohen, by entry of an order dismissing the bankruptcy case under section 1112(b).

63. Moreover, this case, at its core, is nothing more than a two-party dispute between the Debtor and the Trustee, a dispute already being adjudicated in the Surrogate's Court, where the parties have engaged in extensive mediation sessions, and where the Trustee's motion for summary judgment is on the docket.

64.     Yes, the Debtor is approximately $30,000,000 in debt; he has debt to the IRS, debt to New York State, debt to his ex-wife, debt to the family business, debt to his many lawyers, and debts to others, all of which was caused by his habitual recklessness, his inability to honor commitments and to accept responsibility for his actions.  This debt, and the Debtor's inability (or, more aptly, unwillingness) to address it, was the impetus behind the Trust's creation – the Debtor realized that the ramifications of his lifestyle could no longer be ignored, and pleaded with his daughter to clean up the mess.  The express, and most unique, purpose of the Trust is to satisfy the Debtor's debts: "The [Debtor] and Trustee agree that satisfaction and elimination of [Debtor's existing debts] is of utmost importance to the overall health and financial and personal well-being of [the Debtor]" (Ex. B [Trust Agreement], Art. III, ¶C., p. 2).

65.     The Debtor has been entrenched in litigation with the Trustee in Surrogate's Court to challenge and undo the very mechanism he willingly created, and it is irrefutable that the Debtor commenced this case to achieve that same result.  And so, while the Debtor does have numerous creditors, this bankruptcy case boils down to a dispute between the Debtor and the Trustee, which can and should be decided in the Surrogate's Court, a specialized tribunal established for the very purpose of addressing these issues – where the Debtor initially commenced his litigation against the Trustee – not this Court.

66.     Finally, the Debtor does not identify any reorganizational purpose for this bankruptcy case in his Certification. He avers that, "[d]espite significant effort, I have been unable to obtain a reliable list of all assets that were transferred or the value of such assets", and states that he intends to use the bankruptcy process to gain a full understanding of the transfers he made to the Trust (Doc. No. 6, ¶ 8).

67.     Not surprisingly, the Debtor is less than forthcoming with this Court at the outset. Not only does the Assignment list these assets (Ex. B), but the Trustee filed the Accounting in the Accounting Proceeding back in May 2025 (Ex. C), and the Debtor has the ability to seek relief in Surrogate's Court if he is not satisfied with what was provided.

68.     And, while it is true that the Debtor is not able to bring a Section 548 fraudulent transfer cause of action in Surrogate's Court, such a claim is not likely to succeed because (i) the Debtor formed the Trust for the very purpose of providing a mechanism for paying his debts rather than frustrating creditors, (ii) the Debtor was not insolvent when he formed the Trust (indeed, the Debtor indicates in his voluntary bankruptcy petition that his assets exceed his liabilities) and (iii) the Debtor's transfers of assets into the Trust did not leave him unable to pay his debts as the Trust he formed is committed, and has the resources, to do so.

69.     And even if the Debtor were to succeed in avoiding his transfers to the Trust, what then?  The assets transferred to the Trust would belong to the bankruptcy estate and the Debtor would have a fiduciary duty to commit those assets for the benefit of his creditors.  But the Debtor has repeatedly proven himself incapable of, and unwilling to, change his demonstrated behavior and character not only in regard to flouting court orders, but by spending on himself and incurring ever-increasing amounts of debt without regard whatsoever for the concerns of his creditors – which was one of the very reasons the Trust was created. This childishness and reckless behavior not only caused some $30 million of debt, but caused that debt to balloon by preventing the Trustee from taking a specifically directed measures – measures he knowingly and willingly put into place himself – to confront it. Indeed, this behavior granted the Debtor the dubious honor of being # 6 on the New York State Top Delinquent Individual Taxpayers.  (Ex. N (attaching at exhibit 7 thereto a copy of  the New York State Delinquernt Taxpayers Top 250 Individuals

lisitng)). The hypocrisy of the relief the Debtor seeks through his bankruptcy filing is glaring, and, if granted, would bring life to the idiom "the fox guarding the hen house".

70. There is no reason to think the significant assets held by the Trust would be effectively brought to bear for the benefit of the Debtor's creditors were they brought into the bankruptcy estate. Thus, there is no reason to think that the Debtor could successfully reorganize his financial affairs in Chapter 11 even if he succeeds on his fraudulent transfer claim. Thus, in addition to being a bad faith filing, the Debtor's voluntary petition in this case may be frivolous for purposes of Bankruptcy Rule 9011. *See In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991) (a Chapter 11 petition may be "deemed frivolous if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings.").

71. As all the circumstances surrounding the Debtor's commencement of this case indicate it was filed as a litigation tactic against the Trustee and without a reorganizational purpose, the case should be dismissed pursuant to Section 1112(b) for having been filed with a lack of good faith.

## II.

### THE COURT SHOULD ALSO DISMISS THIS CASE PURSUANT TO BANKRUPTCY CODE SECTION 305 UNDER PRINCIPLES OF ABSTENTION

72. For many of the same reasons for which dismissal is required under Section 1112(b)—principally because there is a better mechanism and more appropriate forum for addressing the Debtor's debts—the Court should exercise its discretion under Bankruptcy Code Section 305(a)(1) to dismiss this case under principles of abstention.

73.     Section 305(a)(1) of the Bankruptcy Code provides that:

> The court, after notice and a hearing, may dismiss a case under this title or may suspend all proceedings in a case under this title, at any time if the interests of creditors and the debtor would be better served by such dismissal or suspension.

11 U.S.C. § 305(a)(1).   The legislative history to Section 305 indicates Congress intended bankruptcy courts to use Section 305 to allow them to defer to other proceedings or arrangements, such as out-of-court workouts, when both the creditors and the debtor will benefit by doing so. H.R. Rep. No. 95–595, at 325 (1977); S. Rep. No. 95–989, at 35 (1978).

74.     Bankruptcy courts have utilized Section 305(a)(1) to dismiss involuntary bankruptcy cases commenced by hold-out creditors where there is an out-of-court workout or settlement supported by the debtor and other creditors which the bankruptcy court finds is a better alternative than bankruptcy for the debtor and its creditors.  *See, e.g., In re Trina Associates*, 128 B.R. 858, 867 (Bankr. E.D.N.Y. 1991)  (evaluating whether involuntary bankruptcy petition was in best interest of debtor and creditors, and determining to dismiss bankruptcy petition pursuant to Section 305 to allow settlement agreement entered into in connection with state court litigation to be consummated).   But the application of Section 305(a)(1) is not limited to involuntary bankruptcy cases.  *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 463-64 (Bankr. S.D.N.Y. 2008); *In re Duratech Indus., Inc.*, 241 B.R. 291, 300 (Bankr. E.D.N.Y. 1999) (suspending proceedings in voluntary bankruptcy case).

75.     Bankruptcy courts apply a number of factors in determining whether to abstain by dismissal or suspension, which include: "(1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable

distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought." *Monitor Single Lift*, 381 B.R. at 464-65; *see also In re Efron*, 529 B.R. 396, 405-406 (B.A.P 1st Cir. 2015) (applying similar six-factor test); *In re Traxcell Technolgies, Inc.*, 657 B.R. 453, 464 (Bankr. E.D. Tex. 2024) (applying same seven-factor test as in *Monitor Single Lift*); *In re Trina Associates*, 128 B.R. 858, 867 (Bankr. E.D.N.Y. 1991) (citing similar seven-factor test, but applying three-factor test).  Not all factors need be given equal weight in every case. *Monitor Single Lift*, 381 B.R. at 465.

76.     The factor regarding economy and efficient of administration favors abstention. The Trust has already been established to address the Debtor's Existing Debts, and has been proceeding to market and sell the Sagaponack Property to create a fund sufficient to pay those debts.  The sale process would have advanced much further, likely to completion, if not for the Debtor's obstruction.  But this bankruptcy case is another harmful disruption that has already further delayed the sale that must occur for creditors to be paid, and will result in the Debtor, the Trustee and creditors incurring unnecessary legal fees associated with the bankruptcy case itself. Abstention and dismissal will promote efficiency and economy for both the Debtor and his creditors.  *See Traxcell*, 657 B.R. at 464-65 (granting abstention in favor of state court receivership and finding economy and efficiency factor favors abstention "[b]ecause the liquidation and distribution of the . . . [the debtor's assets] were already set to take place outside the bankruptcy, keeping the case in this Court may hinder the administrative economy and efficiency of the process").

77.     The factor regarding the existence of an alternate forum favors abstention as the Surrogate's Court, where substantial proceedings have already occurred and which is poised to determine the Possession Proceeding in a summary fashion, is well-situated to protect the interests of the Debtor and all stake holders in the Trust. *See Efron,* 529 B.R. at 406, 407-08 (affirming dismissal of individual's Chapter 11 case pursuant to Section 305(a) where debtor filed bankruptcy case seeking to avoid compliance with orders entered in long-running matrimonial litigation with former spouse, finding that only the state court could make the determinations on the issues being litigated between the former spouses and bankruptcy case could not move forward until such issues were resolved).  Indeed, it was the Debtor that commenced the proceedings in Surrogate's Court seeking to undo the formation of the Trust or, alternatively, to remove Muffy as Trustee.

78.     For these same reasons, the third through sixth factors favors abstention.  This federal bankruptcy proceeding is not needed to achieve a just and equitable result (factor 3) as the Trustee has been diligently working to satisfy the Debtor's Existing Debts, and there is a summary proceeding pending in Surrogate's Court to address the issues that are presently hindering her ability to do so.  The provisions of the Trust Agreement adequately address how the assets the Debtor transferred to the Trust should be used to pay his Existing Debts, and the Trust possesses sufficient assets to pay them in full and provide for payment of the Debtor's ongoing living expenses.  Thus, there is no need to resort to a bankruptcy case to ensure the equitable distribution of assets (factor 4).

79.     Regarding factor 5, which calls for a consideration of whether there is an out of court workout that achieves a favorable result, the Debtor himself formed the Trust for several reasons, a principal one being a means for addressing his Existing Debts without court

proceedings. The Surrogate's Court has become involved only because the Debtor commenced litigation there seeking to undo the formation of the Trust. The Debtor's primary creditors are aware of the formation of the Trust and transfer of the Debtor's assets into the Trust and the Trustee is not aware of any creditors taking any actions to call these steps into question. It is only the Debtor himself who seeks to challenge the Trustee's ability to carry out her duties. Hence this factor also favors abstention.

80.     The sixth factor favors abstention because the proceedings in Surrogate's Court are at the point where the Possession Proceeding, once decided, will permit the Sagaponack Property to be sold to address the Debtor's Existing Debts without obstruction from the Debtor; that proceeding is poised to be determined in summary fashion. It would be costly and time-consuming to start afresh in this bankruptcy case in which there is little or nothing for the Debtor to administer unless and until he prevails in the Bankruptcy Code Section 548 avoidance action he intends to commence.

81.     Finally, the seventh factor favors abstention because, for reasons previously explained, the commencement of this bankruptcy case is a blatant attempt at forum-shopping in his two-party dispute with the Trustee, and without a legitimate reorganizational purpose. *See Efron*, 529 B.R. at 409 (dismissal pursuant to Section 305 was proper where bankruptcy case served no reorganization purpose as debtor commenced case to relitigate issues decided against him in state court litigation); *Traxcell*, 657 B.R. at 466 (same).

82.     The Debtor will certainly argue that abstention is not in his best interests, and that he is in the best position to determine what is. This argument overlooks that the Debtor acknowledged when he formed the Trust that "that satisfaction and elimination of the [Debtor's] Existing Debts . . . is of utmost importance to the overall health and financial and personal well-

being of the [Debtor]" (Ex. B [Trust Agreement], Art. III, ¶C., p. 2). This argument also overlooks that the Debtor, in his capacity as a debtor in possession, is a fiduciary with respect to the assets of his bankruptcy estate such that even if he somehow prevailed in the Section 548 avoidance action, he would be obligated to use the assets thereby clawed back from the Trust for the benefit of his creditors. The bankruptcy court in *In re Colonial Ford, Inc.*, 24 B.R. 1014 (Bankr. D. Utah 1981), rejected the debtor's argument that abstention was not in its best interests because, were it otherwise, it would have not filed a bankruptcy case, observing that "[i]f the case is in Chapter 11, for example, the debtor will be a debtor in possession, and hence the trustee or fiduciary for the estate. The interests of the debtor, under these circumstances, are coincidental with the interests of creditors." *Id.* at 1021.

83. Because all the relevant factors favor abstention, which demonstrate that the interests of both the Debtor and his creditors will be better served by dismissal, the Court should dismiss this bankruptcy case pursuant to Section 305(a)(1) of the Bankruptcy Code.

[CONTINUED ON NEXT PAGE]

WHEREFORE, the Trustee respectfully requests that the Court enter an order (a) pursuant to Section 1112(b) dismissing this Chapter 11 case for cause, (b) pursuant to Section 305 dismissing this Chapter 11 case pursuant to principles of abstention, and (c) grant her such other relief to which she is justly entitled.

Dated: Uniondale, New York
        September 22, 2025

                                FARRELL FRITZ, P.C.

                        By:     s/ Patrick Collins
                                Patrick Collins
                                John R. Morken
                                Darren A. Pascarella
                                400 RXR Plaza
                                Uniondale, New York 11556
                                Tel:    (516) 227-0700
                                Fax:    (516) 227-0777

                                *Attorneys for Muffy Flouret, as Trustee of the Mark Perlbinder 2023 Irrevocable Trust*

FF\50017411.3